## Haskins *v.* Pennsylvania Railroad, Appellant.

*Negligence — Railroads — Automobiles—Collision at crossing— Contributory negligence—Evidence—Signals—Positive and negative evidence—Incontrovertible physical facts.*

1. A court cannot accept as true that which the indisputable evidence demonstrates as false.

2. As a general rule a suitor is entitled to have his case submitted to the jury on his own interested testimony, although contradicted by disinterested witnesses; where, however, the party's own testimony stands not only opposed to that of several disinterested witnesses, but also is shown to be untrue by incontrovertible physical facts, the case should not be submitted to the jury.

3. In an action against a railroad company for death caused by a collision between an automobile and a locomotive at a grade crossing, no recovery can be had where the evidence shows that the locomotive and the automobile arrived at the crossing practically at the same time, and that, if the driver had stopped, looked and listened, as asserted, the engine was so near the crossing that he could not have avoided seeing or at least hearing its approach; and especially is such a ruling proper, where it appears that the driver could have seen the locomotive at various points in time to prevent the accident, if he had looked.

4. The positive testimony of the fireman and engineer on a locomotive that a bell was rung and a whistle sounded as the locomotive approached a grade crossing is not to be disregarded in favor of mere negative testimony.

5. In such case, negative testimony of those who did not hear, as against the positive, affirmative testimony of witnesses who did hear, and who were in a position to know, is not enough to support a charge of negligence although the former said they were, at about the time of the accident, listening for the seven o'clock train.

6. Where a witness for plaintiff in an accident case, directly contradicts on the stand a written statement which he previously

made, and denies that he made such statement, and plaintiff claims that the statement was executed when the witness was mentally incompetent, plaintiff must establish such mental disability by evidence clear, precise and convincing as to the evidence of the facts.

Argued May 8, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Appeal, No. 180, Jan. T., 1928, by defendant, from judgment of C. P. Potter Co., March T., 1927, No. 4, on verdict for plaintiff, in case of Kathryn Clare Haskins v. Pennsylvania Railroad Co. Reversed.

Trespass for death of plaintiff's wife. Before HECK, P. J.

The opinion of the Supreme Court states the facts.

Verdict and judgment for plaintiff for $16,000. Defendant appealed.

*Errors assigned* were various rulings and instructions, quoting and referring to record.

*F. D. Gallup,* of *Gallup & Potter,* with him *F. E. Baldwin,* for appellant.—A person approaching a railroad crossing is not only required to stop, look and listen, but to keep a due observation from the stopping point on till the crossing is made: Mensch v. Director Gen., 274 Pa. 356; Provost v. Director Gen., 265 Pa. 589; Seiwel v. Hines, 273 Pa. 259; Sakall v. R. R., 272 Pa. 89; Reiger v. R. R., 258 Pa. 257; Smith v. McAdoo, 266 Pa. 328.

The courts will take judicial cognizance of a well-known law of nature, or mathematics, or the like, and apply it to the physical facts of the case: Lessig v. T. & L. Co., 270 Pa. 299; Bernstein v. R. R., 252 Pa. 581; Thomas v. R. R., 275 Pa. 579.

*Charles J. Margiotti,* with him *William M. Gillespie, Sebastian C. Pugliese* and *Jones & Lewis,* for appellee,

cited: Confer v. R. R., 209 Pa. 425; Kuntz v. R. R., 206 Pa. 162; Smith v. R. R., 158 Pa. 82; Hartig v. Ice Co., 290 Pa. 21; Chew v. Transit Co., 90 Pa. Superior Ct. 155; Milligan v. Ry., 261 Pa. 344.

OPINION BY MR. JUSTICE FRAZER, June 30, 1928:

Kathryn C. Haskins, appellee, sued to recover damages for the death of her husband, Lynn Haskins, who was killed on the afternoon of June 12, 1926, while driving a two-seated automobile, occupied by Haskins and six other persons, over defendant company's railroad tracks on a public grade crossing near the Village of Wetmore, McKean County. The automobile was struck by an engine running light, that is without cars attached; the result of the collision being the partial demolition of the car and killing all of its occupants instantly, with the exception of one, Mike Jaros, who escaped with injuries, which confined him to a hospital for ten days. The jury returned a verdict in favor of plaintiff in the sum of $16,000. Defendant's motions for judgment n. o. v. and for a new trial were refused by the court below and judgment entered on the verdict. Defendant appealed.

The statement of claim alleges that Haskins, while driving his car, "lawfully approached the crossing" and "lawfully started to cross"; that defendant's engine was being driven at an excessive and highly dangerous rate of speed and that neither the bell on the locomotive was rung nor the whistle blown, nor that other timely signal or warning of the engine's approach was given. Defendant filed no affidavit of defense and during the trial counsel for plaintiff withdrew, as a charge of negligence, allegations of excessive speed of their engine. Appellant's assignments of error are directed against refusal by the court of the motions for judgment n. o. v. and for a new trial and the final judgment in plaintiff's favor.

Defendant contends that no negligence on its part was proved and that the injury complained of was the result

of failure of Haskins, the deceased husband of plaintiff, to exercise due care. The undisputed facts as we gather them from the record are as follows: On the afternoon of June 12, 1926, a clear, bright day, Lynn Haskins and six other persons, occupying a two-seated automobile, went from Coudersport to visit friends near the Village of Wetmore. On their way to their destination they drove along a public highway and near Wetmore crossed the public grade crossing over defendant company's tracks. Remaining at the home of their friend for two hours, the seven persons, with Haskins again driving, started on the return journey to Coudersport, passing over the route traversed on their way out. While attempting to drive over the crossing referred to the accident here complained of happened.

We find contradiction in portions of the evidence, but a careful examination of the whole record before us leaves in our minds no doubt that appellant's request for a reversal of the verdict and judgment of the lower court must be answered in the affirmative on the ground that plaintiff's husband was guilty of contributory negligence. As a general rule, a suitor is entitled to have his case submitted to the jury on his own interested testimony, although contradicted by disinterested witnesses; where, however, as here, the party's own testimony stands not only opposed to that of several disinterested witnesses, but is shown to be untrue by incontrovertible physical facts, the case is different. "A court cannot accept as true that which the indisputable evidence demonstrates is false": Lessing v. Reading Transit & L. Co., 270 Pa. 299, 302.

Counsel for plaintiff in their printed argument rely strongly on the testimony of Mike Jaros, the sole survivor of the unfortunate accident, as furnishing the correct recital of the immediate facts connected with it, to the effect that Haskins, driver of the car, when he approached the crossing, stopping the vehicle within twelve or fifteen feet of the first outer rail,—there being two

tracks, four rails, to cross,—then looked to the right and left, and not hearing or seeing the approaching engine, started to drive slowly over the crossing, passed over the two rails of the first track and at the instant the car reached the other track it was struck by the engine. The testimony of Jaros on cross-examination on this phase of the case is as follows: "Q. You say you stopped 12 feet from the tracks? A. 12 or 15 feet, something like that. Q. 12 or 15 feet from the track? A. Yes, sir. Q. Mr. Haskins then looked to the right? A. To the right. Q. Looked to the right and then to the left? A. Left. Q. Did he look again to the right? A. Everybody look; I look too. Q. To the right? A. Yes. Q. Then you started across the track? Immediately you were struck? Right away you were struck? A. Yes, we started after looking once to the other side; he started the car. Q. You started to go across the track and immediately you were struck? A. Yes, sir. Q. Just two or three seconds and you were struck? A. Maybe. Q. Is that right? A. That is right. Q You mean to say that when Mr. Haskins looked the second time to the right and then started ahead, immediately you were struck? A. Looked once and then to the other side and then started. Q. Then he started right up? A. Started. Q. Instantly he was struck? A. When he started the engine I don't remember nothing but a cold wind. Q. Just a few seconds? A. Just a few seconds, then the cold wind came." And further on: "Q. That was the only time you saw Haskins looking, after the car had stopped? A. Yes, it was."

Before giving further attention to this testimony it is proper to note that it is entirely in direct contradiction to declarations made by Jaros in a written statement signed by him in the hospital on the day following the accident, in which he declared the car had not stopped as it reached the crossing. When shown this paper signed by him, at the trial, Jaros denied all knowledge of it, asserted he had not made or signed it and had

not talked to any persons in the hospital until three or four days after the accident. The making of the statement is not denied by appellee, but in an effort to invalidate the writing by showing that Jaros was not mentally capable at the time it was made and signed, plaintiff put on the stand a physician who attended Jaros at the hospital, the extent of whose testimony was: "I would say his mental condition was somewhat impaired, as well as his physical condition. His mind was somewhat confused." In contradiction to Jaros's claim that he was without knowledge of the statement and had talked to no persons in the hospital until three or four days after receiving injury, we have the positive testimony of the representative of defendant company and at least three other persons, one of whom was a physician who had attended Jaros when he first entered the hospital, all of whom testified they were present with Jaros in the hospital when he made the statement the day succeeding the accident, that although he appeared to be in pain, he was not in a dazed condition, that he answered the questions put to him, that after the statement was written out and read to him he suggested changes in it which were made, and that he then signed it. It is significant that Jaros himself on the stand made no pretense of being in a dazed condition when he made the statement, but simply declared he knew nothing about it, had not signed it and had not talked to persons in the hospital until three or four days after his arrival there. Doubtless Jaros was suffering pain the day after the accident when at least four people stood around and prepared the statement in accordance with the answers he gave, but we find nothing in the evidence to convince us that he was not mentally capable at that time. The extent of the consideration the jury gave to the question of the credibility of Jaros, to which the court in its charge called attention, we do not of course know. But we are convinced, from a most careful analysis of the testimony, wherein the evidence of defendant is strongly prepon-

derant, that Jaros was rational at the time the statement was written and read to him, and that he suggested changes which were made before he attached his signature to the paper; it is clear he was not telling the truth when he testified at the trial that he had talked to no one in the hospital until three or four days after he reached that institution. There is no corroborative testimony of that assertion. There is also positive testimony given by the fireman of the engine who saw from his locomotive the car coming along the highway, that when it came to the crossing it did not stop, but was driven directly upon the track and was immediately struck. Having sought to invalidate the written statement on the ground of mental incapacity at the time of its execution, plaintiff must establish such mental disability by evidence clear, precise and convincing as to the existence of the fact: Gibson v. R. R. Co., 164 Pa. 142, 148.

The testimony of Jaros,—whether or not Haskins stopped 12 or 15 feet from the track and then drove upon it, as Jaros claimed, and was struck within two or three seconds after reaching the crossing,—shows clearly that the automobile and the locomotive arrived at the crossing at practically the same time, and it is consequently clear that, if Haskins stopped and looked and listened, at that very instant the engine was so near the crossing that he could not avoid seeing or at least hearing its approach. Under these circumstances it is useless to say he did not see or hear the on-coming engine, which he must have seen had he been even reasonably attentive: Bornscheuer v. Traction Co., 198 Pa. 332, 334. Such testimony is either intentionally false or mistakenly so. It is unquestionably a fact, as shown by the testimony of plaintiff, that Haskins could, at various intervals distant from the crossing, have seen, as he drove toward it, the railroad tracks and the approaching engine as well; that at eleven hundred feet from the crossing a stretch of the railroad was easily visible from the highway, that there were warning signs along the road, and that at a

distance of 38 feet from the crossing, as well as from the point where Jaros claimed Haskins stopped the car, there was an unobstructed view of the tracks, in the direction of the on-coming engine for 700 feet. Yet we are asked to accept the incredible contention that with all opportunities for clearly satisfying himself of the non-approach of an engine or train, and after stopping his car and looking in both directions along the track, he neither saw nor heard the approaching locomotive, and thus apprehensive of no danger went upon the tracks. Yet within a few seconds after entering the crossing the automobile was hit by the engine. There are allowable here but two logical conclusions: Either Haskins stopped and looked, heard and saw the engine approaching, and took his chance of clearing the crossing ahead of it; or else, having, at a point distant from the crossing, observed or heard the engine coming, he took an equally fatal chance, and failed to stop, but drove upon the crossing at the very instant the locomotive arrived at that point. In a case similar in circumstances to the one at hand, Myers v. Baltimore & Ohio R. R., 150 Pa. 386, we said, page 390: "The fact that four or five seconds after he says he looked and listened, he was struck by a train that must have been plainly visible and almost upon him at the time he alleges he looked, is so palpably and absolutely irreconcilable with the truth of his statement that he did stop, look both ways and listen before driving upon the crossing, that it is trifling with justice to permit a jury to find that it is true. It is simply and flatly impossible that one can stop, look and listen for an approaching train that is in plain view and close at hand, and be unable to see or hear it, if he possesses the sense of sight and hearing." In like manner we are unable to reconcile the testimony of Jaros that Haskins stopped and looked, 12 or 15 feet from the crossing, and did not hear or see the engine, when in fact it must have been close to the crossing, with the commonest results of human perception of things through the

senses of sight and hearing.  The legal presumption
therefor is irresistible that Haskins saw or heard the
engine while at some distance from the crossing and de-
ciding he could clear the tracks before the engine ar-
rived, went ahead without stopping, taking the risk of
success or failure.  Or if he did stop, he took the same
risk by not waiting until the engine had gone by, and in
either case he is chargeable with contributory negli-
gence.

The testimony was conflicting with respect to whether
signals were sounded from the engine.  Several wit-
nesses of plaintiff testified they heard neither bell nor
whistle, but their evidence was plainly negative in char-
acter.  It was to the effect that they did not hear warn-
ings, and could have heard the whistle and bell had they
been used.  We observe quite a marked unanimity
among some of them to claim there was special reason
why they would have heard the warning signals, if any
had been given from the engine, from the fact that they
were listening for the bell and whistle of a seven o'clock
train.  But as the accident took place at or before 6:30
o'clock, it does not seem probable that these people
should, on this particular day, without apparent rea-
son, be especially intent upon hearing the bell and
whistle of a train not due for half an hour at least.  On
the other hand, there was positive evidence from at least
six of defendant's witnesses that they heard both bell
and whistle of the engine as it approached the crossing.
The clear and positive declarations of the fireman and
engineer of the locomotive may not be disregarded in
favor of mere negative testimony.  The fireman testified
warnings by bell and whistle as they approached the
crossing were given twice by him and the engineer—
once when they emerged from a small cut two thousand
feet from the Wetmore crossing and a second time, when
they were further on towards the crossing.  He declared
that being on the side of the locomotive from where he
could see the public highway, he saw the Haskins car

"coming down the roadway and was about to call to the engineman to sound the whistle again, but before I said anything, he again blew the whistle. He blew it down to a point within 350 feet of the crossing. I watched the car down to a point just a few feet from the crossing. I was ringing the bell yet, had been ringing it from the time the engineer first sounded the whistle 2,000 feet from the crossing; ringing the bell continually, and when I got to a point where I saw an accident could not be avoided, I called to the engineer. I just hollered to him to 'hold her.' It was only a moment after that we struck the automobile. The automobile was fairly on the track." He further testified that when the engineer heard him call, the latter instantly applied the automatic brake, the independent brake opened the sand valves and put the engine in backward motion. He was asked: "Did you see any effort to stop or slow up the car? A. No, sir." In like positive manner the engineer testified that warnings were given by bell and whistle, as told by the fireman; he had worked on that road for twenty years and as usual on the day of the accident had given all signals where required by whistling signs. Not being on the side of the locomotive from which Haskins's car could be seen approaching the crossing, he knew nothing about the vehicle until it was struck. Four other witnesses for defendant, not interested ones, living at various distances from the railroad declared in most positive terms they heard both whistle and bell when the engine was going toward the crossing. In Urias v. P. R. R. Co., 152 Pa. 326, 328, this court said: "The difference between positive and negative testimony upon a question of this kind is very marked. One witness who hears the ring of a bell is worth more than the testimony of a dozen witnesses who did not hear it, unless in some manner their attention had been especially called to it. The witness who heard the bell either tells the truth, or he tells a deliberate and wilful falsehood, while the witness who did not hear the bell may be and is probably

truthful. The bell may be rung or the whistle blown without attracting the attention of persons who are familiar with such sounds." That statement is signally illustrated and proved by the testimony of one of plaintiff's own witnesses in the present case. She lived at the time of the accident in the railroad house within fifty feet of the tracks and near the crossing where the accident happened. But she could not state whether she had heard this particular engine go by or not, and when asked, "Do you know whether it sounded a bell or don't you?" replied: "I don't know." Living close to the tracks, she had become so entirely familiar with the constant travel of trains and the sound of bells and whistles that, no matter how loud or long they might sound, she would not hear them, unless there was something unusual to attract her attention. Negative testimony of those who do not hear, as against the positive, affirmative testimony of witnesses who do hear, and who were in position to know, is not enough to establish a charge of negligence: Anspach v. Phila., etc., Ry. Co., 225 Pa. 528, 532; Newhard v. P. R. R. Co. 153 Pa. 417.

After giving the entire record in this case most careful examination, we are led to the conclusion that no negligence was shown on the part of defendant company and that, unfortunate and distressing as were the results of the accident, it was caused by the heedlessness and negligence of the driver and other occupants of the automobile, who could have avoided the danger by ordinary precaution and watchfulness.

The assignments of error are sustained and the judgment of the lower court is reversed.